IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE

STATE OF TENNESSEE

COUNTY OF SHELBY

Case No.  23-SW-166

**ATTACHMENT C**
**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

I, **Keyotta Sanford**, a Special Agent with the Federal Bureau of Investigation (FBI), being duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.   I am a Special Agent with the FBI assigned to the Memphis Division and have been a Special Agent since January 2019. I am currently assigned to the Child Exploitation & Human Trafficking Task Force, investigating matters involving the sexual exploitation of children, human trafficking, and child sexual abuse material (CSAM). I have participated in various trainings and investigations involving online and computer related offenses and have executed numerous search warrants, including those involving searches and seizure of computers, digital media and electronically stored information.

2.   I make this affidavit in support of an application for a search warrant for information associated with certain Snap, Inc. accounts associated with the identifier, **"daltonlyles23"**, that is stored at premises controlled by Snap, Inc., which is an electronic communications and remote computing service provider headquartered at 2772 Donald Douglas Loop North, Santa Monica, CA 90405. The information to be searched is described in the following paragraphs and in **Attachment A**. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Snap, Inc. to disclose to the government copies of the information (including the content of communications) further described in Section I of **Attachment B**. Upon receipt of the information described in Section I of **Attachment B**, government-authorized persons will review that information to locate the items described in Section II of **Attachment B**.

1



3.  Based on my training and experience, and facts as set forth in this affidavit, there is probable cause to believe that items which constitute instrumentalities, fruits, and evidence of violations of 18 U.S.C. § 2251(a) (production/attempted of child pornography) and 18 U.S.C. § 1470 (transfer of obscene material to a minor) are contained within information associated within the Snap, Inc. identifier **"daltonlyles23"** (hereby by known as the "Snapchat Account"), which is described more fully in **Attachment A**.

4.  The following information was obtained through observations and conversations of your affiant personally, through the assistance of other law enforcement agents and agencies, including their reports, and through other sources specifically named in this affidavit. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence of violations of **18 U.S.C. §§ 2251(a) and 1470** will be located at the premises described in **Attachment A**, and consist of or be contained in the items listed in **Attachment B**, both of which are incorporated by reference as if fully set forth herein.

## APPLICABLE STATUTES AND DEFINITIONS

5.  As noted above, this investigation concerns alleged violations of the following:

    a.  18 U.S.C. § 2251(a) makes it a federal offense for anyone to knowingly employ, use, persuade, induce, entice, or coerce any minor to engage in sexually explicit conduct as defined in 18 U.S.C. § 2256, for the purpose of producing a visual depiction of such conduct, or attempts to do so.

    b.  18 U.S.C. § 1470 makes it a federal offense for anyone, using a means of interstate or foreign commerce, to knowingly transfer obscene material to another individual who has not attained the age of 16 years, or attempts to do so.

6.  The following definitions apply to this affidavit and Attachment B.

    a.  The term "minor," as used herein, is defined pursuant to Title 18 U.S.C. §2256(1) as "any person under the age of eighteen years."

    b.  As it is used in 18 U.S.C. § 2252, the term "sexually explicit conduct" is defined in 18 U.S.C. § 2256(2)(A), and includes sexual intercourse of any kind, whether between

2



persons of the same or opposite sex; bestiality; masturbation; sadistic or masochistic abuse; and the lascivious exhibition of genital or pubic area.

c.    As it is used in 18 U.S.C. § 2252A(a)(2), the term "child pornography" is defined in 18 U.S.C. § 2256(8), and includes any visual depiction, including any photograph, film, video, picture, or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where: (A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct; (B) such visual depiction is a digital image, computer image, or computer generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or (C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in "sexually explicit conduct".

d.    The term "sexually explicit conduct" has the same meaning in § 2252A as in §2252, except that for the definition of child pornography contained in § 2256(8)(B), "sexually explicit conduct" also has the meaning contained in § 2256(2)(B), to include (a) graphic sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex, or lascivious simulated sexual intercourse where the genitals, breast, or pubic area of any person is exhibited; (b) graphic or lascivious simulated; (i) bestiality; (ii) masturbation; (iii) sadistic or masochistic abuse; or (c) graphic or simulated lascivious exhibition of the genitals or pubic area of any person.

e.    The term "graphic," as used in the definition of sexually explicit conduct contained in 18 U.S.C. § 2256(2)(B), is defined pursuant to 18 U.S.C. § 2256(10) to mean "that a viewer can observe any part of the genitals or pubic area of any depicted person or animal during any part of the time that the sexually explicit conduct is being depicted."

f.    The term "visual depiction," as used herein, is defined pursuant to Title 18 U.S.C. § 2256(5) to include "undeveloped film and videotape, and data stored on computer disk or by electronic means which is capable of conversion into a visual image."

g.    The term "producing," as used herein, is defined pursuant to Title 18 U.S.C. §2256(3) to include "producing, directing, manufacturing, issuing, publishing, or advertising".

3

KS
4/4/2023

h.   The term "computer" is defined in Title 18 U.S.C. § 1030(e)(I) as an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

i.   The term "Internet", as used herein, refers to the global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices' communication with each other are in the same state.

j.   The term "Internet Protocol" (IP) address, as used herein, refers to a unique number used by an Internet accessible device, which is used to access the Internet. IP addresses are assigned by "Internet Service Providers" or "ISPs", which are commercial organizations that provide a range of functions for their customers including access to the Internet, web hosting, email, and remote storage.

k.   The term "electronic communication service" is defined in Title 18 U.S.C. §2510(15) as any service which provides to users thereof the ability to send or receive wire or "electronic communications", which refer to any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photo-electronic or photo-optical system that affects interstate or foreign commerce.

l.   The term "electronic storage" as defined in Title 18 U.S.C. § 2510 (17) means any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and any storage of such communication by an "electronic communication service" for purposes of backup protection of such communication.

m.   The term "electronic device", as used herein, is defined as any portable, electrical powered device capable of sending or receiving a wireless signal; storing, sending, or retrieving electronic data; or having computing capability.

n.   The term "chat/chat group", as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally shorter, resembling an oral conversation, and are distinguished from other text-based online communications such as Internet forums and email.

4



## CHARACTERISTICS OF INDIVIDUALS WHO ACCESS WITH INTENT TO VIEW, PRODUCE, RECEIVE AND POSSESS CHILD PORNOGRAPHY

7.   Based on my knowledge, training, and experience in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, there are certain characteristics that are prevalent among individuals who are involved in the production and receipt of child pornography:

a.   The majority of individuals who produce and receive child pornography are persons who have a sexual attraction to children, and may engage in the sexual abuse of children or exchange and collect child pornography and child erotica to receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature and communications about such activity.

b.   Individuals who produce and receive child pornography may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videos, drawings or other visual media. Not only do these individuals oftentimes use these materials for their own sexual arousal and gratification, but they also may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.   The majority of individuals who collect, receive and produce child pornography often seek out like-minded individuals, either in person or via the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance, and support. Individuals who collect and produce child pornography often correspond with and/or meet others to share information and materials and often maintain lists of names, usernames, addresses, emails, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography and child sexual abuse.

d.   Persons committing these criminal acts, more likely than not, almost always possess and maintain their hard copy and/or digital medium collections of child pornographic and child erotica material in a secure and private environment. Due to the

5

*KS*
*4/7/2023*

psychological support their collections provide, such individuals find comfort and justification for their illicit behavior and desires and rarely destroy such materials. As such, these collections are often maintained for several years and are kept close by, usually in a location that is mobile and/or easily accessible to the individual.

e.   In some cases, people who have a sexual interest in children have been found to download, view, then delete child pornography on a cyclical and repetitive basis, and to regularly delete any communications about the sexual abuse of children rather than storing such evidence on their computers of digital devices. Traces of such activity can often be found on computers or digital devices for months or even years after any downloaded files have been deleted.

f.   Individuals that receive and collector child pornography frequently prefer not to be without their child pornography for any prolonged time period, and more likely than not may go to great lengths to conceal and protect their collection of illicit materials from discovery, theft, and damage. This behavior has been documented by law enforcement officers involved in child exploitation and pornography investigations worldwide.

## INVESTIGATION

8.   On January 17, 2023, the FBI Memphis Child Exploitation and Human Trafficking Task Force received a tip from an Investigator with the Lauderdale County Sheriff's Office regarding allegations of the online sexual exploitation of a 12 year-old female. According to school administrators and the child's mother, the minor appeared to have been actively communicating with an unknown adult male via Snapchat.

9.   Earlier that morning, school administrators were alerted that the minor victim had expressed suicidal thoughts to another student. School administrators spoke with the child who confirmed having suicidal thoughts and advised that her boyfriend was able to talk her down. When asked to describe her boyfriend, the child stated that he was a 19 year-old male living in Georgia and that the two communicated via her iPad which she had brought to school. The mother of the child reviewed her daughter's iPad and observed a Snapchat conversation between an individual she believed to be her daughter's alleged boyfriend from Georgia, referred to as "Dalton Lyles hubby." The mother was concerned because her daughter had sent the unknown male the address to her home and identifiable pictures, some of which depicted the child wearing

6



a bra and revealing her cleavage. The mother also believed that her daughter had video chatted with the phone number, 229-387-1420, since there appeared to be calls on the child's iPad saved under the contact labeled "Bae." The phone number appeared to have been provided to the child by the unknown male via Snapchat.

10. Consent was provided to search the child's iPad and for agents to assume the minor's Snapchat account. On January 17, 2023, a trained FBI Online Covert Employee (OCE), who was posing as the 12 year-old victim was contacted by Snapchat account "daltonlyles23." The individual using the Snapchat username "daltonlyles23" sent what appeared to be a live "Snap," which your affiant knows is generally when a picture is taken within Snapchat and not a picture that is selected from a user's camera roll. The image appeared to be of a Caucasian male wearing a hat with the word "ORGILL." The male depicted in the Snap photo sent to the child appeared to be the same male in the screensaver photo on the child's iPad. (See photos below.)




Figure 1: Image observed on iPad          Figure 2: Snap sent to OCE

11. On January 18, 2023, the OCE (hereby referred to as KL) was contacted by Lyles and after exchanging greetings, he sent her a Snap of himself in what appeared to be a vehicle and advised he was almost at work. As their conversation continued, KL warned Lyles she didn't want him getting her in trouble in class for not paying attention. Lyles responded, "you probably thinking about getting my cock tonight" and that she would be getting "fucked" after he got out of church later that day. Lyles ended their exchange by telling KL he had to bet back to work and sent a Snap of himself wearing a hat with the word "ORGILL" on it.

7

KS
4/4/2023

12. Throughout the remainder of the day, Lyles continued to make sexually explicit comments towards KL, at one point asking if he could tie her up and hit her. KL advised she didn't want him to get "in trouble for child abuse." Lyles responded, "only if you say something." Lyles then told KL "and no masturbating until we ft tonight." Your affiant is aware that the term "ft" is an abbreviation for FaceTime, which can also refer to video chatting. At approximately 4:26 PM, Lyles attempted to video chat KL. On the following day, after a brief exchange, KL apologized to Lyles for missing his call and advised that her iPad had broken the previous night. KL told Lyles that her friend agreed to give her an old phone to use since her friend was "officially a teenager" and getting a new phone for her birthday.

13. On January 20, 2023, a forensic interview was conducted of the minor victim. The minor explained that she met Lyles around the first of January 2023 on the website "teen-chat.org," which is a website for teenagers between the ages of 13 and 19 years of age to meet and socialize online. When asked what Lyles knew about her, the minor admitted that she told him her real name and address. The minor also disclosed that on one occasion Lyles asked her if she was in 7th grade, which she confirmed. Therefore, she believed Lyles thought she was 13 years-old as that was the age depicted on her teen-chat profile. The minor victim said that she believed Lyles drove a white F-150 truck and did something with welding for work.

14. When asked about her relationship with Lyles, the minor victim advised that Lyles was her boyfriend even though he had told her not to tell anyone about the two of them as he did not want anyone to know about their relationship. The minor victim further described their relationship as somewhat sexual. She explained that Lyles would "play with himself" or masturbate during video calls and would ask to see her body. The minor specified she had seen Lyles face over Snapchat video calls and also through FaceTime. She said that they would call one another almost daily. When asked if they had seen each other's private areas, the minor confided that Lyles requested to see her vagina and she sent him an image because she was afraid if she did not he would stop speaking with her and possibly end their relationship. After she sent him the picture, Lyles continued to ask for additional sexually explicit images. While she did not send additional pictures of her vagina, she did send him pictures of her feet and pictures wearing a bra. Lyles had also sent a nude picture of himself in what she believed was a bathroom. She explained that she could see his face and his penis in the photo.

15. On January 27, 2023, Lyles engaged in another conversation with KL over Snapchat.

8



During the conversation, Lyles made several references to being "horny" and how he missed her "pussy and feet." Further, Lyles asked if they could FaceTime that night. When KL explained that she could not take the pictures he requested while she was in class, Lyles told her that he did not care and continued to make sexually explicit comments throughout the conversation. For instance, he told her that he was going to beat her "cunt" with his hand and fuck her until she screamed and cried for him to stop. Lyles followed up the discussion by sending another snap, which appeared visually similar to other images identified as Lyles. Towards the end of their conversation, Lyles confided that he wished KL was physically with him. She responded that she felt the same and stated, "if I was old enough 2 drive… I would prolly be there now."

16. A subpoena was sent to Snap, Inc. seeking subscriber information associated with the Snapchat account "daltonlyles23" between the dates of December 1, 2022 and January 18, 2023. On January 30, 2023, Snap, Inc. provided the following subscriber information and IP address logs:

| | |
|---|---|
| **Display Name** | Dalton Lyles |
| **Email Address** | Lylesdalton784@gmail.com |
| **Phone** | 229-387-1420 |
| **Created On** | 1/6/2023 @ 4:11:34 (UTC[1]) |
| **Creation IP Address** | 38.40.8.77 |
| **Other Notable IP** | 38.40.8.68, 174.229.19.138 |

The Snap, Inc. records also identified that the Snapchat account was created on 1/6/2023 using an iOS device. Your affiant knows iOS is the operating system used on Apple products, such as the iPhone and iPad.

17. An open source "who-is" search for IP addresses 38.40.8.77 and 38.40.8.68, which were provided by Snap, Inc. as being used to access the account "daltonlyles23" between January 6,

---

[1] Coordinated Universal Time or UTC is the primary time standard by which the world regulates clocks and time. It is within about 1 second of mean solar time at 0° longitude and is not adjusted for daylight saving time. It is effectively a successor to Greenwich Mean Time (GMT), which is a time zone used by a few countries in Africa and Western Europe, including the UK during winter.

2023 and January 18, 2023. The IP addresses 38.40.8.77 and 38.40.8.68 were registered to Conexon Connect for assignment to their Internet customers in Ocilla, Georgia. The IP address 174.229.19.138 was registered to Verizon Wireless and appeared to be for assignment to their mobile customers. Your affiant is aware that IP addresses assigned to mobile phones from cellular telephone service providers are constantly changing. Open source research also showed that the phone number associated with the account (229-387-1420) was registered to Verizon Wireless.

18. Investigators sent a subpoena to Conexon Connect seeking subscriber information associated with the IP address 38.40.8.77 on 1/6/2023 at 4:11:35 (UTC) and for IP address 38.40.8.68 on 1/15/2023 at 4:23:13 (UTC), which were provided by Snapchat as being used by the account "daltonlyles23." On February 6, 2023, Conexon Connect provided the following subscriber information:

| IP Address | 38.40.8.77 | IP Address | 38.40.8.68 |
|---|---|---|---|
| Subscriber | Mark Lyles | Subscriber | Sandra Walker |
| Location | 274 Lyles Camp Rd, Ocilla GA 31774 | Location | 188 Lyles Camp Rd, Ocilla GA 31774 |

19. A subpoena was sent to Verizon Wireless seeking subscriber information associated with phone number 229-387-1420, which was registered to the Snapchat account and observed on the iPad used by the minor victim. On January 30, 2023, Verizon Wireless identified the subscriber as Mark Lyles located at residential address 188 Lyles Camp Rd, Ocilla, GA. The contact name registered to the account was "Dalton L".

20. Open source research identified a potential suspect as Dalton Wayne Lyles, date of birth (DOB) 10/24/2002, SSN 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. A search of the Georgia Department of Motor Vehicles database provided Dalton Wayne Lyles' driver's license photo, which appears to be the same individual depicted in the photos sent to KL over Snapchat. Dalton Wayne Lyles' driver's license listed his residential address as 188 Lyles Camp Rd, Ocilla GA 31774.

KS
4/4/2023

10



*Figure 3: Driver's License Photo*

21. On March 8, 2023, a federal search warrant was executed in the Middle District of Georgia at the residence of Dalton Lyles.  Lyles voluntarily agreed to speak with FBI agents. During his interview, Lyles identified the Snapchat username "daltonlyles23" as belonging to him and confirmed he knew KL was a minor.  The two used Snapchat and FaceTime to communicate with one another.  In particular, they would masturbate together and the minor victim would send Lyles nude images via Snapchat, to include material consistent with CSAM, of herself at his request.  Pursuant to the execution of the search warrant, a forensic examination was conducted on an iPhone which was seized from Lyles.  The Snapchat account with the identifier, "daltonlyles23" was observed on the device.  Additionally, the account appeared to have been in communication with other unidentified individuals, the majority of which appeared to be female.

22. Based on the forgoing factual information, your affiant submits there is probable cause to believe that violations of U.S.C. §§ 1470 and 2251(a) have been committed, and evidence, instrumentalities and fruits of those violations are located on the Snapchat Account further described in **Attachments A and B** of this affidavit.

11

## INFORMATION REGARDING SNAPCHAT

23. Snapchat is a social networking service owned by Snap, Inc. and headquartered at 2772 Donald Douglas Loop North, Santa Monica, California. Snapchat is an application for sending and receiving messages, pictures and videos that 'self-delete' after they are viewed.

24. A "snap" is a picture or video message taken and shared with other Snapchat users in real-time. Once a snap has been viewed, it is deleted from the company's server and is no longer visible to the recipient. Snapchat users can send direct messages to others using the Chat feature. Once a user leaves the Chat screen, messages viewed by both the sender and the receiver will no longer be visible. The application notifies other users when they are online so they can begin messaging each other. In addition, Snapchat users can send pictures to other users by utilizing the camera on their device. Pictures can also be sent from the saved pictures in the photo gallery of the device. Accessing a Snapchat account and "snaps" constitute "electronic communications".

25. "Our Stories" is a collection of user-submitted "snaps" from different locations and events. Snapchat users, with the location services of their device turned on, can contribute to a collection of snaps regarding the event. For example, multiple different Snapchat users at a party could all contribute to the same "Our Stories" collection by sharing their snaps, even if they do not know each other. Users can also view "Our Stories" events if they are not actually present at the event by subscribing to the story. In addition to "Our Stories", a Snapchat user can keep photo/video diary using the "Story" feature. Each snap in a "Story" documents the user's experience. Based on the user's privacy settings, the photos and videos added to a "Story" can be viewed either by everyone on Snapchat or just the user's friend. Stories are visible to other users for up to 24 hours.

26. While a Snapchat message may disappear, the record of who sent it and when still exists. Snapchat records and retains information that is roughly analogous to the call detail records maintained by telecommunications companies. This includes the date, time, sender, and recipient of a Snap. Additionally, Snapchat stores the number of messages exchanged, which users are communicated with the most, message status including if and when the message was opened, and whether the receivers used the native screen capture function of their device to take a picture of the snap before it disappeared.

27. Snapchat asks users to provide basic contact and personal identifying information. When users create an account, they make a unique Snapchat username. This is the name visible to other



Snapchat users. An email address is required to register a Snapchat account and a new user must also provide a mobile phone number. This phone number is verified during the registration process. Snapchat sends an activation code which must be entered before proceeding with the registration step. However, users may elect to bypass entering a phone number so one may not always be present in the user's account. Snapchat also retains the account creation date.

28. Snapchat stores device information such as the model, operating system, operation system version, mobile device phone number, and mobile network information of devices used in conjunction with the service. Snapchat also collects unique device identifiers such as the Media Access Control (MAC) address and the International Mobile Equipment Identifier (IMEI) or Mobile Equipment Identifier (MEID) of devices used to access Snapchat. In the event the Snapchat user's application crashes, the company also collects a list of other installed applications on the device to detect any potential software conflicts.

29. Snapchat has a "Group Stories" feature allowing multiple users to contribute photos and videos to the same "Story," a collection of posts that stay viewable for a limited number of times. Snapchatters can name their group story and invite other users and "friends" by username to add content. The Group Stories will disappear if 24 hours pass without a user adding a new photo or video.

30. In some cases, account users will communicate directly with the service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Application providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In addition, application providers often have records of the IP addresses used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help identify which computers or other devices were used to access the account.

31. Snapchat allows users to subscribe to its service by using email addresses, phone numbers, and creating a profile name. The users can the post and share photographs and videos with other users whom they follow or follow them. Users can also send a direct message to other users and also send photographs or videos directly to another user. The Snapchat application is primarily used on a mobile device, such as an iPhone, Android phone, iPad or tablet.

KS
4/4/2023

## JURISDICTION

32. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## CONCLUSION

33. Based on the forgoing factual information, your affiant submits there is probable cause to believe that violations of 18 U.S.C. §§ 2251(a) and 1470 have been committed, and evidence of those violations can be found in the Snapchat Account, stored at premises controlled by Snapchat. Your affiant respectfully requests that the Court issue a search warrant authorizing the search and seizure of items described in **Attachment B** of this Affidavit.

34. This application seeks a warrant to search all responsive records and information under the control of Snap, Inc., a provider subject to the jurisdiction of this court, regardless of where Snap, Inc. has chosen to store such information. The government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications and any records or other information pertaining to the customers or subscribers if such communication, record, or other information is within Snapchat's possession, custody, or control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States.

35. Your affiant is aware that many providers of digital services, such as Snap, Inc., have staff members who work shifts other than traditional business hours. Such staff members may at times be responsible for compiling materials responsive to search warrants. Therefore, your affiant requests that this warrant be executable at any time of the day or night, as that may be more convenient for the responding party.

36. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

37. In consideration of the foregoing, your affiant respectfully requests that this Court issue a search warrant for the search of the Snapchat Accounts, more specifically described in

14

KS
4/4/2023

**Attachment A** which is incorporated by reference as if fully set forth herein, authorizing the seizure and search of the items described in **Attachment B**, incorporated herein.

AND FURTHER, AFFIANT SAITH NOT.

Keyotta Sanford - AFFIANT
Special Agent,
Federal Bureau of Investigation.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 41 by telephone, this 4th day of April, 2023.

s/Annie T. Christoff

HON. ANNIE T. CHRISTOFF
United States Magistrate Judge

15